| | |
|---|---|
| **DISTRICT COURT, PITKIN COUNTY STATE OF COLORADO**<br>506 E. Main, Suite 103<br>Aspen, CO 81611<br>(970) 925-7635 | DATE FILED: December 10, 2020 1:02 PM<br>FILING ID: 5B1326B3834A9<br>CASE NUMBER: 2020CV30111 |
| **Plaintiff:** SAGOME, INC. D/B/A L'HOSTARIA<br><br>v.<br><br>**Defendant:** THE CINCINNATI INSURANCE COMPANY | |
| *Attorneys for Plaintiff:*<br>Bradley A. Levin, No. 13095<br>Susan S. Minamizono, No. 48984<br>**LEVIN SITCOFF PC**<br>1512 Larimer Street, Suite 650<br>Denver, Colorado 80202<br>Phone Number: 303-575-9390<br>Fax Number: 303-575-9385<br>bal@levinsitcoff.com<br>ssm@levinsitcoff.com | ▲ **COURT USE ONLY** ▲<br><br>Case Number:<br><br><br>Div.: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff, Sagome, Inc. d/b/a L'Hostaria, by and through its counsel, LEVIN SITCOFF PC, states and alleges as follows for its Complaint and Jury Demand:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Sagome, Inc. d/b/a L'Hostaria ("L'Hostaria"), is and was, at all times pertinent, a Colorado corporation with its principal place of business in Aspen, Colorado.

2. Upon information and belief, Defendant, The Cincinnati Insurance Company ("Cincinnati") is incorporated under the laws of the State of Ohio with its principal place of business in Cincinnati, Ohio, and is authorized to do business and is doing business in the State of Colorado.

3. At all times pertinent hereto, Cincinnati was conducting the business of insurance in Colorado by, *inter alia*, insuring the real property and business operations of L'Hostaria.

**EXHIBIT A**

4. This Court has personal jurisdiction over Defendant pursuant to C.R.S. § 13-1-124(1)(a) and (b), and it has subject matter jurisdiction over the claims asserted herein.

5. Venue is proper in this district pursuant to C.R.C.P. 98(c), which Plaintiff designates as the place of trial of this action.

## THE COVID-19 PANDEMIC

6. COVID-19 is a communicable disease that is highly infectious.

7. On March 11, 2020, the World Health Organization declared that COVID-19 constituted a global pandemic.

8. When a person infected with COVID-19 coughs or sneezes, droplets containing the virus can be dispersed into and remain in the air and/or deposited on surfaces.

9. A recent research article published in Virology Journal concluded that COVID-19 can survive on nonporous surfaces for at least 28 days at 20 degrees Celsius (68 degrees Fahrenheit) and 50% humidity.

10. The results of a study published in The New England Journal of Medicine suggests that individuals could get COVID-19 through indirect contact with surfaces or objects used by an infected person, whether or not they were symptomatic.

11. Further, a research article published in the Journal of the American Medical Association "suggest[ ] small, virus-laden droplets may be displaced by airflows and deposited on equipment such as vents."

12. This makes property exposed to COVID-19 unsafe and dangerous.

13. The secondary exposure of surfaces to humans is particularly concerning in places where people gather to eat, drink, and socialize, such as restaurants.

14. According to a report by the Centers for Disease Control and Prevention, adults with positive COVID-19 test results were approximately twice as likely to have reported dining at a restaurant than were those with negative test results.

15. Any person who touches a surface containing the COVID-19 virus—who then touches his or her face—can become infected with the virus and spread it to other people.

16. The average person touches his or her face approximately 2,000 times a day.

17. The clinical features of COVID-19 vary from asymptomatic forms to fatal conditions of severe respiratory failure that requires ventilation and support in an intensive care unit.

18. Pneumonia has been the most frequent severe manifestation of COVID-19, with symptoms of fever, cough, dyspnea, and bilateral infiltrates on chest imaging.

19. An effective vaccine for COVID-19 has not yet been distributed to the general public.

20. Scientists have discovered that COVID-19 has several modes of transmission.

21. Pursuant to a "Situation Report" issued by the World Health Organization, the virus can be transmitted through symptomatic transmission, pre-symptomatic transmission, or asymptomatic transmission.

22. Symptomatic transmission refers to transmission by an individual who is experiencing symptoms associated with the virus who then transfers COVID-19 to another person, object, or surface.

23. The incubation period for COVID-19, which is the time between exposure to the virus (becoming infected) and symptom onset, averages 5-6 days, however, it can be up to 14 days.

24. During this period, also known as the "pre-symptomatic period," some infected persons can be contagious.

25. For this reason, transmission of COVID-19 from a pre-symptomatic person can occur before symptom onset.

26. An individual who does not develop symptoms, an asymptomatic case of COVID-19, can still transmit the disease to another.

27. Restaurant operations have been recognized as posing a greater risk than the average risk of spread.

28. As the number of infected persons rises, the number of people killed by the disease rises.

29. As of the date of this filing, there have been more than 15.2 million confirmed cases of COVID-19 in the United States—more than any other country.

30. 286,443 of those Americans have died from the disease.

31. As of the date of this filing, 268,589 people have been infected with COVID-19 in Colorado.

32. 2,784 of those Coloradans have died from the disease.

### **PROPERTY DAMAGE AND LOSS ARISING FROM COVID-19**

33. In 2006, Insurance Standards Office ("ISO"), the insurance industry's advisory organization, issued a circular which advised state insurance commissioners that "[d]isease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses."

34. On March 10, 2020, Colorado Governor Jared Polis verbally declared a state of disaster emergency in Colorado due to the presence of COVID-19 within the State.

35. On March 11, 2020, Governor Polis memorialized this state of disaster emergency in Executive Order D 2020 003.

36. Executive Order D 2020 003 explained that Colorado defines a "disaster" as "the occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any natural cause or cause of human origin, including but not limited to…epidemic."

37. On March 13, 2020, the President of the United States declared a National Emergency due to COVID-19.

38. On March 16, 2020, following Executive Order D 2020 003, the Executive Director of the Colorado Department of Public Health and Environment ("CDPHE") issued Public Health Order 20-22.

39. Public Health Order 20-22 was implemented to stop the spread of COVID-19.

40. In Public Health Order 20-22, the Executive Director of the CDPHE made a finding that COVID-19 is a respiratory illness that is transmitted through person-to-person contact "or by contact with surfaces contaminated with the virus."

41. Public Health Order 20-22 in part "close[d] bars, restaurants, gyms, theaters, casinos, nonessential personal services facilities and horse track and off-track betting facilities to slow the spread of the COVID-19 virus."

42. Public Health Order 20-22 was issued pursuant to the CDPHE's authority "to <u>exercise such physical control over property</u> and the persons of the people within this state as the department may find necessary for the protection of public health." (Emphasis added.)

43. On March 27, 2020, the Executive Director of the CDPHE issued its second updated Public Health Order 20-24 in response to the existence of hundreds of confirmed and presumptive cases of COVID-19 and related deaths across the State of Colorado.

44. Public Health Order 20-24 stated that "<u>COVID-19 also physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time</u>." (Emphasis added.)

45. By imposing social distancing requirements on all persons in the State of Colorado and prohibiting gatherings outside a residence, Public Health Order 20-24 stated that it "<u>helps reduce the property damage caused by COVID-19</u> and preserves the welfare of our residents by reducing the spread of the disease in our communities and our workplaces…." (Emphasis added.)

46. Indeed, the expressed intent of Public Health Order 20-24 "is to minimize contact between residents and to the greatest extent possible minimize the exposure of the public to <u>contaminated public surfaces</u>." (Emphasis added.)

47. Restaurants expose their employees and the public to surfaces contaminated by COVID-19, which can survive on nonporous surfaces for weeks.

48. On April 1, 2020, Governor Polis issued Executive Order D 2020 024.

49. Like Public Health Order 20-24, Executive Order D 2020 024 stated that "<u>COVID-19 also physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time</u>." (Emphasis added.)

50. Executive Order D 2020 032 issued by Governor Polis on April 8, 2020, again stated that COVID-19 physically contributes to property loss, contamination, and damage due to its propensity to attach to surfaces for prolonged periods of time.

51. Recently, on November 20, 2020, the Executive Director of the CDPHE issued the Second Amended Public Health Order 20 -36.

52. Second Amended Public Health Order 20 -36 requires the sanitation of restaurant and bar premises, including measures to "[m]inimize or eliminate high touch surfaces and multi-use objects."

53. On November 28, 2020, Governor Polis issued Executive Order D 2020 265.

54. Executive Order D 2020 265 stated that the virus causing COVID-19 "can also be spread through contact with contaminated surfaces."

55. COVID-19 is ubiquitous in certain areas such as Aspen, where L'Hostaria is located.

56. As of December 14, 2020, all travelers arriving in Aspen and Pitkin County must complete an online travel affidavit prior to arrival, must receive a negative COVID-19 test result within 72 hours of arrival, and have been symptom-free for 10 days prior to travel.

57. COVID-19 has been present on L'Hostaria's premises, as customers and at least one former employee have tested positive for the virus.

58. COVID-19 has also been present on the premises of other businesses in the area immediately surrounding L'Hostaria.

59. When L'Hostaria was allowed to partially reopen its business, it undertook some repairs and alterations on the premises.

60. As stated by the 2006 ISO circular and the recent executive and public health orders, COVID-19 physically contributes to property loss, contamination, and damage.

## THE POLICY

61. Cincinnati issued a policy of property insurance to L'Hostaria, Policy No. EPP 0366265 (the "Policy").

62. The Policy's term is from January 1, 2020, until January 1, 2021.

63. The Policy limits for Business Personal Property is $690,000, with an additional blanket coverage limit of $150,000 under the Cinciplus Commercial Property Power XC+ (Expanded Coverage Plus) Endorsement.

64. Additionally, the Policy provides Business Income with Extra Expense coverage for up to 18 months of "Actual Loss Sustained."

65. The Policy states:

> **SECTION A. COVERAGE**
> We will pay for direct "loss" to Covered Property at the "premises" caused by or resulting from any Covered Cause of Loss.

66. The Policy defines "loss" as "accidental physical loss or accidental physical damage."

67. The Policy does not further define "accidental physical loss" or "accidental physical damage."

68. The Policy defines "premises" as "the Locations and Buildings described in the Declarations."

69. The address for L'Hostaria is listed in the Policy's Schedule of Locations.

70. The Policy defines "Covered Property" as the building (including, but not limited to, completed additions; fixtures; permanently installed machinery and equipment and building glass; and personal property, including appliances used for refrigerating, ventilating, cooking, dishwashing or laundering) and business personal property, including but not limited to, furniture and machinery and equipment.

71. The Policy does not exclude viruses or communicable diseases as a "Covered Cause of Loss."

72. Nor does the Policy contain a virus or communicable disease exclusion.

*Business Income and Extra Expense Coverage Extension*

73. The Policy states, in pertinent part:

> **(1) Business Income**
>
> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. With respect to "loss" to personal property in the open or personal property in a vehicle or portable storage unit, the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

7

74. The Policy defines "suspension" as "[t]he slowdown or cessation of your business activities."

75. The Policy defines "operations" as "[y]our business activities occurring at the 'premises'."

76. The Actual Loss Sustained Business Income Endorsement, which modifies the Policy, defines "period of restoration" as the period of time that begins at the time of direct "loss" and ends on the earlier of "(1) [t]he date when the property at the 'premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; (2) [t]he date when business is resumed at a new permanent location; or (3) [t]he number of consecutive months after the date of direct physical 'loss' indicated in the Schedule of this endorsement."

77. L'Hostaria ceased its business operations on March 16, 2020, pursuant to the applicable Executive and Public Health Orders.

78. Although L'Hostaria reopened on April 27, 2020, it resumed with only limited curbside pickup and dining, in accordance with the applicable Executive and Public Health Orders.

79. More recently, restaurants in Pitkin County, such as L'Hostaria, has been ordered to operate indoor dining at only 25% capacity or allow 50 people, whichever is fewer.

80. L'Hostaria incurred, and continues to incur, business interruption losses of approximately $40,000 per month as a result of the suspension of its operations caused by direct loss to property at its premises due to the presence of COVID-19.

81. The Policy also insures actual loss of business income caused by action of civil authority and states:

> **(3) Civil Authority**
>
> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:
>
> (a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
>
> (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

82. Public access to L'Hostaria was prohibited during various time frames since March 16, 2020 by action of civil authority.

83. Public access to other businesses immediately surrounding L'Hostaria was likewise prohibited by civil authority to prevent the spread of COVID-19.

84. L'Hostaria incurred, and continues to incur, business interruption losses due to civil orders prohibiting or restricting access to the restaurant and other nearby businesses.

85. The Policy also provides Extra Expense coverage and states:

(2) **Extra Expense**

   (a) We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs **(2)(b), (c)** and **(d)**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

   (b) If these expenses reduce the otherwise payable "Business Income" "loss", we will pay expenses (other than the expense to repair or replace property as described in Paragraph **(2)(c)**) to:

      1) Avoid or minimize the "suspension" of business and to continue "operations" either:

         a) At the "premises"; or

         b) At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

      2) Minimize the "suspension" of business if you cannot continue "operations".

   (c) We will also pay expenses to:

      1) Repair or replace property; or

      2) Research, replace or restore the lost information on damaged "valuable papers and records";

     but only to the extent this payment reduces the otherwise payable "Business Income" "loss". If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal

> "operations", the amount we will pay under this Coverage will be reduced by the salvage value of that property.
>
> (d) Extra Expense does not apply to "loss" to Covered Property as described in the **BUILDING AND PERSONAL PROPERTY COVERAGE FORM**.

86. L'Hostaria has incurred, and will incur in the future, expenses during the "period of restoration" that it would not have sustained if there had been no direct "loss" to its property.

87. The Policy further provides Extended Business Income coverage for actual loss of Business Income and Extra Expense incurred during the period beginning on the date the property is actually repaired, rebuilt or replaced and "operations" are resumed; and ends on the earlier of "[t]he date you could restore your 'operations', with reasonable speed, to the level which would generate the business income amount that would have existed if no direct 'loss' had occurred;" or 60 consecutive days after the date the property is actually repaired, rebuilt or replaced and "operations" are resumed.

88. L'Hostaria's operations have not yet resumed to the level which would generate the business income amount that existed prior to March 16, 2020.

**CINCINNATI'S FAILURE TO INVESTIGATE AND REJECTION OF CLAIMS**

89. On April 3, 2020, L'Hostaria tendered notice of loss under the Policy for the damages it sustained due to the COVID-19 pandemic and the government-mandated closure of its business.

90. L'Hostaria's notice was timely.

91. The timing of L'Hostaria's notice resulted in no prejudice to Cincinnati.

92. On April 6, 2020, Cincinnati sent a letter to L'Hostaria, informing its insured that "[d]irect physical loss or damage generally means a physical effect on Covered Property, such as a deformation, permanent change in physical appearance or other manifestation of a physical effect."

93. However, the Policy does not contain this definition for "direct physical loss or damage."

94. Cincinnati proceeded to ask L'Hostaria for documents and information regarding any "direct physical loss or damage," based on the misleading definition not contained anywhere in the Policy.

95. On April 29, 2020, after receiving information from L'Hostaria based on the improperly misleading definition of "direct physical loss or damage," Cincinnati sent a letter to L'Hostaria denying coverage for the loss.

96. On October 29, 2020, L'Hostaria requested that Cincinnati reconsider its denial of coverage, and advised that COVID-19 had been present on the premises, as customers and at least one former employee had tested positive for the virus.

97. Cincinnati did not perform any further investigation with respect to L'Hostaria's claim, including the impact of the information provided by L'Hostaria concerning persons who had tested positive for the virus. Instead, on November 17, 2020, Cincinnati's retained coverage counsel affirmed the insurer's denial of Policy coverage.

98. L'Hostaria has complied with all conditions precedent to coverage under the Policy and/or such conditions have been waived, released, prevented, or excused by Cincinnati's unreasonable conduct and/or breach of the Policy.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

99. L'Hostaria incorporates all allegations of this Complaint as if fully set forth herein.

100. The Policy is a valid and enforceable contract of insurance.

101. Cincinnati's acts and omissions as described herein constitute a breach of the Policy, including, but not limited to, its failure to pay benefits owed to L'Hostaria under the Policy's Actual Loss Sustained Business Income, Civil Authority, Extra Expense, and Extended Business Income Coverage provisions.

102. As a direct and proximate result of Cincinnati's breaches of the Policy, L'Hostaria has suffered and is entitled to damages in amounts to be proved at trial, including without limitation the amount of the benefits owed and/or wrongfully withheld under the Policy.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract)

103. L'Hostaria incorporates all allegations of this Complaint as if fully set forth herein.

104. Under the Policy's implied covenant of good faith and fair dealing, Cincinnati covenanted that it would deal with L'Hostaria fairly and honestly, and do nothing to impair, hinder, or injure L'Hostaria's rights to benefits under the Policy.

105. Through the acts and omissions described above, Cincinnati breached that covenant. Cincinnati's conduct fell below the applicable common law and industry standards of care, violated the duties of good faith and fair dealing, and constituted the tort of bad faith breach of insurance contract.

106. Cincinnati's acts and omissions were unreasonable and Cincinnati knew so, and/or Cincinnati acted with reckless disregard for L'Hostaria's rights and interests.

107. Cincinnati's acts and omissions were committed in disregard of L'Hostaria's reasonable expectations as an insured under the Policy.

108. Cincinnati breached its duty of good faith and fair dealing through the following unreasonable acts, among others:

    a. Depriving L'Hostaria of the benefits and protections of the Policy;

    b. Placing its own interests above those of L'Hostaria;

    c. Failing to timely pay benefits owed under the Policy;

    d. Misrepresenting facts concerning the Policy's coverage;

    e. Failing to conduct a reasonable and impartial investigation of the loss based upon all available information;

    f. Forcing L'Hostaria to bring a lawsuit to recover benefits owed and protections guaranteed under the Policy;

    g. Violating the Unfair Claims Settlement Practices Act; and

    h. Other conduct to be discovered in the course of these proceedings.

109. As a direct and proximate result of Cincinnati's bad faith breach of the Policy, L'Hostaria has suffered and is entitled to damages in amounts to be proved at trial.

### THIRD CLAIM FOR RELIEF
**(Violation of C.R.S. § 10-3-1115 and Relief Under § 10-3-1116)**

110. L'Hostaria incorporates all allegations of this Complaint as if fully set forth herein.

111. Sections 10-3-1115(1) and (2), C.R.S., forbid insurers such as Cincinnati from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

112. L'Hostaria is a first-party claimant as that term is used under C.R.S. § 10-3-1115(1)(A)(I).

113. Cincinnati is an entity engaged in the business of insurance.

114. Cincinnati delayed and/or denied payment of first-party benefits owed to L'Hostaria and did so without a reasonable basis within the meaning of C.R.S. § 10-3-1115(2) for the reasons set forth above.

115. Section 10-3-1116, C.R.S., provides that a first-party claimant whose claim has been unreasonably delayed or denied by an insurer may bring an action to recover reasonable attorneys' fees and court costs and two times the covered benefit that was unreasonably delayed or denied.

116. As described herein, Cincinnati's acts and omissions violated C.R.S. § 10-3-1115(2).

117. L'Hostaria therefore brings this claim to recover damages awardable under C.R.S. § 10-3-1116, separate from and in addition to those remedies and damages available under any other applicable claims for relief.

**Fourth Claim for Relief**
**(Declaratory Judgment)**

118. L'Hostaria incorporates all allegations of this Complaint as if fully set forth herein.

119. The Policy is a contract under which L'Hostaria paid Cincinnati substantial premiums in exchange for Cincinnati's promise to pay L'Hostaria's claims for losses covered by the Policy.

120. L'Hostaria has complied with all applicable provisions of the Policy and/or those provisions have been waived by Cincinnati, but Cincinnati has vitiated its obligations toward L'Hostaria pursuant to the Policy's terms.

121. An actual case or controversy exists regarding L'Hostaria's rights and Cincinnati's obligations under the Policy to provide benefits and coverage for the losses incurred by L'Hostaria in connection with the COVID-19 pandemic and the government-mandated closure of L'Hostaria's property.

122.  Pursuant to C.R.C.P. 57, L'Hostaria seeks a declaratory judgment from the Court declaring the following:

   a. That L'Hostaria's losses incurred due to the COVID-19 pandemic and government-mandated closure of its property are insured losses under the Policy; and

   b. Cincinnati is obligated to pay L'Hostaria for the full amount of the losses it has incurred in connection with the COVID-19 pandemic and government-mandated closure of L'Hostaria's property.

**WHEREFORE**, Plaintiff, Sagome, Inc. d/b/a L'Hostaria, requests that the Court enter judgment in its favor and against Defendant, The Cincinnati Insurance Company, and award damages as follows:

   a. For all benefits due under the Policy for covered losses;

   b. For other compensatory economic damages in amounts to be proved at trial;

   c. For two-times the covered benefit as permitted by C.R.S. § 10-3-1116(1);

   d. For reasonable attorneys' fees, costs, and expenses incurred herein;

   e. For all pre- and post-judgment interest, statutory and moratory, as permitted by law;

   f. For a declaratory judgment as set forth above; and

   g. For such other and further relief as the law permits and this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

DATED this 10th day of December 2020.

Respectfully submitted,

**LEVIN SITCOFF PC**

*s/ Susan S. Minamizono*
Bradley A. Levin
Susan S. Minamizono
*Attorneys for Plaintiff*

**Plaintiff's Address:**
620 E. Hyman Ave.
Aspen, CO 81611